IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Pharmacists Mutual Insurance Company, ) | |
| ) | C.A. No.: 7:04-1922-HMH |
| Plaintiff, ) | |
| ) | |
| vs. ) | **OPINION AND ORDER** |
| ) | |
| Urgent Care Pharmacy, Inc.; W. Ray ) | |
| Burns; R. Ken Mason, Jr.; G. David ) | |
| Scyster, Administrator of the ) | |
| Estate of Mary Virginia Scyster and ) | |
| Individually; Virginia Rauch; ) | |
| Vivian Conrad; Donald M. Boles; Annie ) | |
| McGill; Evelyn Arroyo; Daniel W. ) | |
| Bowman; James Hickman; Shirley ) | |
| Kus; Robert D. Black; and Deborah ) | |
| J. Hensley, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on cross motions for summary judgment. After a review of the law and facts of this case, the court denies Pharmacists Mutual Insurance Company's ("PMIC") motion for summary judgment and grants G. David Scyster ("Scyster"), Virginia Rauch ("Rauch"), Vivian Conrad ("Conrad"),[1] Annie McGill ("McGill"), and Donald M. Boles' ("Boles") (collectively "Movants") motion for summary judgment.[2]

_____

[1] Conrad is deceased. However, the estate has not been substituted as a party in this case.

[2] Urgent Care Pharmacy, Inc., W. Ray Burns, Evelyn Arroyo, Daniel W. Bowman, James Hickman, Shirley Kus, Robert D. Black, and Deborah J. Hensley have not appeared in this action. R. Ken Mason has not filed a dispositive motion.

1

## I. FACTUAL BACKGROUND

PMIC filed a declaratory judgment action to determine whether R. Ken Mason, Jr.'s ("Mason") actions as pharmacist-in-charge of Urgent Care Pharmacy, Inc. ("Urgent Care") are covered under Mason's professional liability insurance policy, Policy Number PHL 005575100 ("Policy"), for the period of June 19, 2002, to June 19, 2003.  (Pl.'s Mem. Supp. Summ. J. Ex. 1 (Policy).)  The Policy contains a two million dollar per occurrence limit and a six million dollar aggregate limit.  (Id.)  Urgent Care was a compounding pharmacy in Spartanburg, South Carolina, owned by W. Ray Burns ("Burns").  As pharmacist-in-charge, Mason did not personally compound drugs at Urgent Care, but supervised technicians who did.  (Movants' Mem. Supp. Summ. J. 16 Ex. B (Mason Dep. 27-28, & 124-25).)

In particular, Urgent Care had the capability to make methylprednisolone (hereinafter "Drug"), a sterile Drug that is typically injected into the lower back to treat pain.  (Id. 10.)  During the first part of 2002, the Drug became commercially unavailable because the manufacturer, UpJohn, ceased manufacturing it.  (Id. )  As such, health care providers sought an alternate source for the Drug.  Dr. Scott Johnston ("Dr. Johnston") of the Johnston Pain Clinic in North Carolina contacted Urgent Care regarding its ability to compound the Drug.  Subsequently, Dr. Johnston ordered individual dose vials of the Drug for administration solely in his pain clinic.  (Id. Ex. C. (Johnston Dep. 41-42, 52, & 65 ).)  From March 5, 2002, to August 20, 2002, Urgent Care sold 525 vials of the Drug to Johnston Pain Clinic.  (Pl.'s Mem. Supp. Summ. J. 18 Ex. 6 (Johnston Pain Orders).)  No specific patients were identified in any of the orders for the Drugs.

2

In addition, Dr. Burt Place ("Dr. Place") of Pinehurst Anesthesia Associates was interested in obtaining the Drug for his pain clinic located at Moore Regional Hospital ("Moore Regional") in North Carolina.  At the request of Dr. Place, Douglas Pait ("Pait"), a sales and marketing associate for Urgent Care, met with Dr. Place and Tom Smith ("Smith") and Brad Pusser ("Pusser"), Moore Regional pharmacists, to discuss Urgent Care's compounding abilities.  (Movants' Mem. Supp. Summ. J. Ex. D. (Pusser Dep. 31-32).)  Dr. Place had requested that Smith and Pusser assist him in evaluating whether Urgent Care was a reliable source for compounded drugs.  (Movants' Mem. Supp. Mot. Summ. J. Ex. D. (Pusser Dep. 31-32, 41-42).)  Pait provided information to the men regarding Urgent Care's compounding ability with respect to the Drug.  (Id. Ex. D. (Pusser Dep. 32-37).)

Subsequently, Dr. Place ordered the Drug from Urgent Care in individual dose vials for administration at Moore Regional's pain clinic.  (Id. Ex. D. (Pusser Dep. 37-38, 45-47, 54-55, & 60-62)  The Drug was shipped to Dr. Place's office at Moore Regional.  (Id. Ex. D. (Pusser Dep.86, 89-91).)  After receiving the order, Dr. Place took it to Pusser at the Moore Regional pharmacy so Pusser could check the shipment.  (Id. Ex. D. (Pusser Dep. 86, 89-90).)  Moore Regional paid for the Drug.  (Pl.'s Mem. Supp. Mot. Summ. J. 12 Ex. K (Pusser Dep. 24).)  The Drug was administered solely in Moore Regional's pain clinic by Dr. Place and his partners and was not resold to patients by Moore Regional's pharmacy. (Movants' Mem. Supp. Summ. J. Ex. D. (Pusser Dep. 88-91).)  From May 6, 2002, to June 5, 2002, Urgent Care sold 557 vials of the Drug to Dr. Place's pain clinic at Moore Regional Hospital.  (Pl.'s Mem. Supp. Mot. Summ. J. 10 Ex. 3 (Moore Regional Orders).)   No specific patients were identified for any of the orders for the Drugs.

3

In mid-2002, Johnston Pain Clinic and Moore Regional's patients who had been injected with the Drug began to get sick. It was later determined that the Drug was contaminated with a fungus. As a result, the South Carolina Board of Pharmacy ("Board") investigated Urgent Care. The Board's investigation revealed several deficiencies related to the Drug and other drugs made by Urgent Care. (Movants' Mem. Supp. Mot. Summ. J. 15.) The Board issued a Cease and Desist Order on September 27, 2002, which provided in pertinent part that Mason and Urgent Care had "not been adhering to good compounding practices based on the existence of a pharmacist/patient/pharmacist relationship which is considered manufacturing as stated in the South Carolina Pharmacy Practice Act Section 40-43-(CC)(2)(b)." (Pl.'s Mem. Supp. Summ. J. 8 Ex. 16 (Cease and Desist Order).)

A number of civil lawsuits ("underlying lawsuits") have been filed against Mason and Urgent Care seeking damages as a result of the fungal contamination of the Drug. (Id. 2.) The Movants are persons who were injured or killed as a result of receiving injections of the Drug. (Movants' Mem. Supp. Summ. J. 4-5.)

In its motion for summary judgment, PMIC seeks a declaration that the Movants' claims are not covered because Urgent Care was manufacturing the Drug in violation of the Policy in that: 1) there was no practitioner/patient/pharmacist relationship (hereinafter "triad relationship") present; 2) Urgent Care participated in the marketing of drugs, which constitutes manufacturing under the Policy; and 3) Urgent Care made the Drug in advance of receiving a prescription drug order and without a historical basis for doing so. (Pl.'s Mem. Supp. Summ. J. 5.) Alternatively, PMIC seeks a declaration that the Policy excludes coverage under the illegality exclusion because Mason willfully violated the law. (Id. 31.)

4

Finally, PMIC seeks a declaration that McGill, Conrad, and Scyster's claims are not covered because their bodily injury did not occur during the Policy coverage period.  (Id.  33.)

The Movants also filed a motion for summary judgment on their counterclaim requesting a declaration that (1) "Mason's liability in the underlying claims arises out of pharmacy services for which PMIC's policy" provides coverage; (2) the illegality exclusion in the Policy does not exclude coverage; and (3) McGill and Conrad's injuries occurred during the Policy period.  (Movants' Mem. Supp. Mot. Summ J. 5.)  In addition, the Movants seek a declaration that Mason's actions as pharmacist-in-charge are covered under the Policy even if Urgent Care was manufacturing the Drug.  (Id.)  Finally, the Movants seek a declaration that the Policy provides primary coverage if no other coverage protects Mason.  (Id.)

## II. DISCUSSION OF THE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the  party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56(c) mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the

5

governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

### B. Manufacturing Claims

PMIC seeks a declaration that the Movants' claims are not covered because Urgent Care was manufacturing the Drug in violation of the Policy in the following ways: 1) the requisite triad relationship was not present; 2) Urgent Care participated in marketing of drugs; and 3) Urgent Care made the Drug in advance of receiving a prescription drug order and without a historical basis for doing so. The Movants' motion for summary judgment on their counterclaim requests a declaration that Mason's actions are covered under the Policy because the Drug was compounded.

"Insurance policies are subject to general rules of contract construction." State Farm Mut. Auto. Ins. Co. v. Calcutt, 530 S.E.2d 896, 897 (S.C. Ct. App. 2000) (internal quotation marks omitted). Courts must "give policy language its plain, ordinary and popular meaning." Id. "When the contract is unambiguous, clear, and explicit, it must be construed according to the terms used by the parties." Myers v. Nat'l States Ins. Co., 606 S.E.2d 486, 488 (S.C. Ct. App. 2004). In addition, courts should not rewrite policy language or torture its meaning to extend coverage never intended by the parties. Torrington Co. v. Aetna Cas. & Sur. Co., 216 S.E.2d 547, 550 (S.C. 1975). However, "[a]mbiguous or conflicting terms in an insurance policy must be construed liberally in favor of the insured and strictly against the insurer." Stewart v. State Farm Mut. Auto. Ins. Co., 533 S.E.2d 597, 601 (S.C. Ct. App. 2000).

6

1. The Triad Relationship

First, PMIC alleges that the Policy does not cover the Movants' claims because the lack of a triad relationship resulted in Urgent Care manufacturing the Drug under the Policy. The triad relationship requires a specific patient to be identified in a drug order.  It is undisputed that Dr. Johnston and Dr. Place's orders for the Drug from Urgent Care did not identify specific patients.  As such, there was no triad relationship present.  However, the Movants contend that the Policy did not require a triad relationship for coverage.

The Policy covers pharmacy services as follows:

> **We** will pay on **your** (but not **your employer's**) behalf the **ultimate net loss** in excess of the underlying insurance which you shall become legally obligated to pay as damages because of an **occurrence** . . . to which the insurance applies, and arising out of **your** rendering or failure to render **pharmacy services**.

(Pl.'s Mem. Supp. Mot. Summ. J. Ex. 1 (Policy Section II.A., p. 2).)  Pharmacy services includes in part

> the interpretation, evaluation and dispensing of prescription orders. .  .  . **Compounding** and labeling of drugs and devices (except labeling by a manufacturer, repackager, or distributor of non-prescription drugs and commercially packaged legend drugs and devices.)  **Pharmacy services** does not include **manufacturing**.

(Id. Ex. 1 (Policy Section I., p. 2).)  The Policy defines manufacturing as

> the production, preparation, propagation, conversion, or processing of a drug or device, either directly or indirectly, by extraction from substances of natural origin or independently by means of chemical or biological synthesis, and includes any packaging or repackaging of the substance(s) or labeling or relabeling of its container, and the promotion and marketing of such drugs or devices. **Manufacturing** also includes the preparation and promotion of commercially available products from bulk compounds for resale by pharmacies, practitioners, or other persons.

(Id.)  The Policy defines compounding as

> the preparation, mixing, assembling, packaging, or labeling of a drug or device (I) as the result of a practitioner's prescription drug order or initiative based on the practitioner/patient/pharmacist relationship in the course of professional practice, or (ii) for the purpose of, or as incident to, research, teaching, or chemical analysis and not for sale or dispensing. **Compounding** also includes the preparation of drugs or devices in anticipation of prescription drug orders based on routine, regularly observed prescribing patterns. **<u>Compounding</u>** <u>also includes such other practices as are approved as a part of the practice of pharmacy by the Board of Pharmacy in the state in which **you** practice.</u>

(<u>Id.</u> Ex. 1 (Policy Section I, p. 1).) (emphasis added). The South Carolina Pharmacy Practice Act ("Act") has been codified in section 40-43-10 et. seq. of the Code of Laws of South Carolina. Based on the plain language of the Policy, if the Act permits a pharmacy to make drugs without the presence of the triad relationship, then it was permissible under the Policy for Urgent Care to make the Drug absent the triad relationship.

PMIC alleges that under the Act, the triad relationship is required for compounding. PMIC relies on section 40-43-86(CC)(2)(f), which states that "[t]he compounding of drugs in anticipation of receiving prescriptions without a historical basis or the distribution of compounded products without a patient/practitioner/pharmacist relationship is considered manufacturing." S.C. Code Ann. § 40-43-86(CC)(2)(f) (2001). The plaintiff's expert, Hugh Mobley ("Mobley"), a South Carolina pharmacist who helped draft the Act, testified during his deposition that the triad relationship "should be valid in all cases" of compounding. (Pl.'s Mem. Supp. Summ. J. Ex. H (Mobley Dep. 41).)

In contrast, the Movants contend that the Policy allowed Urgent Care to compound the Drug without the triad relationship because the Act does not require the triad relationship. Subsections 40-43-86(CC)(1) and (2)(e) respectively provide: "(CC)(1) The provisions of this subsection only apply to the compounding of medication by pharmacies permitted in the State

8

of South Carolina," and "Pharmacists may not offer compounded medications to other pharmacies for resale; <u>however, a pharmacist may compound products based on an order from a practitioner for use by practitioners for patient use in institutional or office settings</u>." (emphasis added).

"The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature." <u>Garvin v. South Carolina</u>, 615 S.E.2d 451, 453 (S.C. 2005). "What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will." <u>Knotts v. South Carolina Dept. of Natural Res.</u>, 558 S.E.2d 511, 516 (S.C. 2002). "[T]he words of the statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation." <u>Mun. Ass'n of South Carolina v. AT&T Commc'ns of S. States, Inc.</u>, 606 S.E.2d 468, 470 (S.C. 2004). Further, "[w]hen the terms of a statute are clear, the court must apply those terms according to their literal meaning." <u>Georgia-Carolina Bail Bonds, Inc. v. County of Aiken</u>, 579 S.E.2d 334, 337 (S.C. Ct. App. 2003).

The court finds that subsection 40-43-86(CC)(2)(e) plainly allowed Urgent Care to compound the Drug for use in an institutional or office setting without identifying a specific patient. This subsection does not conflict with subsection 40-43-86(CC)(2)(f), which prohibits the distribution of a drug without a triad relationship. The court "must construe a statute to give effect to all of its provisions. Every word, clause, and sentence must be given some meaning, force, and effect, if it can be done by any reasonable construction." <u>Breeden v. TCW, Inc./Tennessee Express</u>, 584 S.E.2d 379, 383 n.7 (S.C. 2003) (internal quotation marks and citation omitted). The only reasonable construction of section 40-43-86 is that the

triad relationship is not required when drugs are compounded pursuant to an order by a practitioner for use solely in an institutional or office setting, because subsection 40-43-86(CC)(2)(e) unambiguously permits this activity without requiring the presence of the triad relationship.  To find otherwise would render this subsection meaningless.

Moreover, Lee Ann Bundrick ("Bundrick"), director of the Board, and Sheila Young ("Young"), manager of regulatory compliance for the Board, testified that it is permissible for a pharmacy to compound a drug for an order without identification of the patients if the drug compounded is to be administered in the physician's office.  (Movants' Mem. Supp. Summ. J. Ex. I. (Young Dep. 18) & Ex. O (Bundrick Dep. 66-67).).

Although the Board issued a Cease and Desist Order which stated generally that Urgent Care and Mason had "not been adhering to good compounding practices based on the existence of a pharmacist/patient/pharmacist relationship which is considered manufacturing as stated in the South Carolina Pharmacy Practice Act Section 40-43-(CC)(2)(b)," the Board did not specify that the Cease and Desist Order applied to the Drug.  (Id. 21 Ex. I (Young Dep. 14-15).)  Notably, based on her investigation of Urgent Care, Young concluded that the Drug was compounded, not manufactured.  (Id.)  However, Young testified that the investigation revealed that Urgent Care was manufacturing two other drugs.  (Id.)

PMIC relies on the testimony of Eddie Durant ("Durant"), a Board investigator who assisted in the investigation of Urgent Care.  Durant testified that the triad relationship was required for compounding.  (Pl.'s Mem. Supp.  Summ. J. 7 Ex. D (Durant Dep. 57-58).)  However, Durant testified that his role in the investigation did not focus on the Drug at issue in this case.  (Def.'s Mem. Supp. Mot. Summ. J. Ex. Q (Durant Dep. 54).)  Further, he

testified that the Act permits a physician to order a drug for administration in the physician's office without identifying a specific patient.  (Id. Ex. Q (Durant Dep. 74-75).)  In addition, PMIC's own expert, Hugh Mobley, testified that a specific patient name is not required by the Act if a physician orders compounded drugs for use in the physician's office.  (Id. 23 Ex. G (Mobley Dep. 98-99).)

It is undisputed that all of the Drug ordered by Dr. Johnston was administered to patients by him and his practice group at Johnston Pain Clinic, and all of the Drug ordered by Dr. Place was administered to patients by Dr. Place and his group at Moore Regional's pain clinic.  (Movants' Mem. Supp. Mot. Summ. J. Ex. C (Johnston Dep. 65 & 72) & Ex. D (Pusser Dep. 88-91).)  Further, Mason testified that although Urgent Care compounded the Drug in quantities greater than ordered in anticipation of future orders, it compounded the Drug only at the request of a physician's office and never compounded the Drug except in response to a physician's order.  (Id. Ex. B (Mason Dep. 25-26, 38-40, 96-97, & 110).)  Based on the foregoing, the court finds that there is no genuine issue of material fact concerning Urgent Care's alleged manufacturing of the Drug because of the lack of a triad relationship.  Therefore, PMIC's Motion for summary judgment on this ground is denied.

### 2.  Marketing

Second, PMIC alleges that the Policy does not cover the Movants' claims because Urgent Care was marketing drugs.  Under the policy, "**Manufacturing** also includes the preparation and promotion of commercially available products from bulk compounds for resale by pharmacies, practitioners, or other persons."  (Pl.'s Mem. Supp. Summ. J. Ex. 1

(Policy section I, p. 2) (emphasis in original).)  As such, marketing is considered manufacturing, which is not covered under the Policy.

The Policy was issued to Mason, not Urgent Care.  It states that

> [w]e will pay on **your** (but not your employer's) behalf the **ultimate net loss** in excess of the underlying insurance which you shall become legally obligated to pay as damages because of an **occurrence** . . . to which the insurance applies, and arising out of **your** rendering or failure to render **pharmacy services**.

(Id. Ex. 1 (Policy section II.A., p. 2).)  The Policy covers Mason's acts, not Urgent Care's acts.  PMIC alleges that Urgent Care was marketing drugs because it had a full-time salesman, a sales and marketing team, a telemarketer, and a website promoting specific products, and because Burns was heavily involved in marketing.  (Id. 21-28.)  However, there is no evidence that Mason was involved in any marketing activities.  Therefore, there is no genuine issue of material fact concerning Mason's marketing drugs, and PMIC's motion for summary judgment on this ground is denied.

### 3.  Making the Drug in Anticipation of Receiving Prescriptions

Third, PMIC alleges that Urgent Care was manufacturing the Drug because it made the Drug "in anticipation of receiving prescriptions without a historical basis," which constitutes manufacturing under section 40-43-86(CC)(2)(f).  (Id. 29.)  Specifically, PMIC contends that "[b]ecause Urgent Care produced methylprednisolone prior to receiving prescriptions and without ever receiving a prescription for methylprednisolone from that practitioner before, and without a history of receiving prescriptions from that practitioner, Urgent Care was manufacturing methylprednisolone."  (Id. 29.)

The records before the court indicate that Johnston Pain Clinic first ordered the Drug on February 25, 2002.  (Pl.'s Mem. Supp. Summ. J. Ex. 13 (Feb. 25, 2002, Order).)

12

Another record reveals that Urgent Care shipped Johnston Pain Clinic 17 vials of 80mg strength Drug from lot number 020602@5 made on February 6, 2002, to fill an order placed by Johnston Pain Clinic on March 27, 2002.  (Id. Ex. 14 (March 27, 2002, Order) & Ex. 15 (Spreadsheet of Orders for Drug).)  Vials from this lot were also sent to a Dr. Robert Feldman ("Dr. Feldman") on March 5, 2002, and to a Dr. Thomas A. Duc ("Dr. Duc") on April 29, 2002.  (Id. Ex. 15 (Spreadsheet of Orders for Drug).)  There is no evidence that either Dr. Feldman and Dr. Duc had ever ordered the Drug from Urgent Care prior to February 6, 2002.  PMIC argues that because Urgent Care filled these first-time orders from these doctors with Drug that had been made on February 6, 2002, Urgent Care was making the Drug "in anticipation of receiving prescriptions without a historical basis" in violation of section 40-43-86(CC)(2)(f).

The court disagrees.  Mason testified that the Drug was made in anticipation of future orders based on the history of Drug orders he had received.  (Movants' Reply Supp. Summ. J. 6 Ex. B (Mason Dep. 25-26, 38-40, 96-97, & 110).)  In fact, Urgent Care received additional orders for the Drug, and the previously-made Drug was utilized to fill future orders.  (Pl.'s Mem. Supp. Summ. J. Ex. 15 (Spreadsheet of Orders for Drug).)  In addition, Young testified that it was permissible for the Drug to be made in amounts exceeding a specific order in anticipation of future orders based on previous prescribing patterns for the Drug.  (Movants' Mem. Supp. Summ. J. Ex. I (Young Dep. 21, 24-27, & 47-50).)  Further, when Young investigated Urgent Care, she found evidence of previous, routine prescribing practices for the Drug.  (Id. Ex. I (Young Dep. 21).)  As such, there is no genuine issue of material fact concerning Urgent Care's alleged noncompliance with section 40-43-86(CC)(2)(f) for making

13

excess Drug in anticipation of future drug orders without a historical basis. As set forth above, the Policy covers any activity permitted under South Carolina law with regard to compounding. Therefore, PMIC's motion for summary judgment on this ground is denied.[3] Further, the court grants the Movants' motion for summary judgment requesting a declaration that the Policy covers Mason's liability in the Movants' underlying claims.[4]

### C. Illegality Exclusion

Alternatively, PMIC seeks a declaration that Mason's actions are not covered under the Policy due to an exclusion barring coverage if Mason willfully violated the law. (Pl.'s Mem. Supp. Summ. J. Ex. 1 (Policy VIII G).) In turn, the Movants seek a declaration that this exclusion does not apply because there is no evidence of any willful conduct by Mason.

The Policy excludes coverage for "Damages caused by **your** willful violation of a regulation or statute pertaining to the practice of pharmacy or any other willful violation of a penal statute or ordinance committed by **you** or with **your** knowledge or consent." (Id. Ex. 1 (Policy VIII G).) "Wilful means intentional." Reeves v. Carolina Foundry & Mach. Works,

---

[3]Having found that the Drug was compounded in greater quantities than ordered in anticipation of future drug orders in compliance with the Act and the Policy, the court need not address the Movants' argument that the Drug was compounded in compliance with the Policy language which provides that "Compounding also includes the preparation of drugs or devices in anticipation of prescription drug orders based on routine, regularly observed prescribing patterns." (Movants' Mem. Supp. Summ. J. 23.)

[4]Because the Drug was compounded in compliance with the Policy, the court need not address the Movants' argument that "even if the methylprednisolone had been manufactured and not compounded . . . and Mr. Mason was outside of coverage provided by the policy for compounding, the Policy still provided him with coverage in . . . connection with his services as [pharmacist-in-charge] and for liability arising out of his failure as [pharmacist-in-charge] to have proper policies and procedures in place at Urgent Care." (Movants' Mem. Supp. Summ. J. 25-27.)

9 S.E.2d 919, 921 (S.C. 1940) (internal quotation marks omitted).  PMIC argues that Mason's actions were willful because (1) he testified that "he was familiar with the Act, and that Burns told him a triad relationship was required for compounding"; (2) Mason was "capable of following the requirements set forth by the Act"; and (3) "Mason failed to comply with certain provisions of the Act, and a reasonable person would realize that such violations would threaten the health and safety of individuals exposed to drugs made by Urgent Care."  (Pl.'s Mem. Opp'n Movants' Summ. J. 9.)  Further, PMIC alleges that Urgent Care's goal was to increase its compounding activities because it made more money from compounding than dispensing regular drugs.  (Pl.'s Mem. Supp. Summ. J. 31.)  PMIC also notes that Boles and McGill allege in the underlying lawsuits that Mason and Urgent Care are liable for willful and wanton acts.  (Pl.'s Mem. Opp'n Movants' Summ. J. 9.)

 The court finds that there is no evidence of Mason's intent to violate the law.  Neither Mason's testimony that he was aware of the requirements of the Act nor the Board's determination that Urgent Care and Mason violated provisions of it indicates that Mason was intentionally violating the law.  In fact, the only evidence regarding Mason's intent is his own testimony.  Mason testified that he believed that the Drug was compounded in compliance with the law.  (Movants' Mem. Supp.  Summ. J. 12 Ex. B. (Mason Dep. 12-15, 41-44, 62, 127-128, 134-35).)  Further, as discussed earlier, a triad relationship was not required for compounding of the Drug.  As such, the court denies PMIC's motion for summary judgment and grants the Movants' motion for summary judgment on this ground.

15

### D.  Occurrence as to McGill, Conrad, and Scyster

PMIC also requests that the court declare that McGill, Conrad, and Scyster's claims did not occur during the Policy period.  In contrast, the Movants seek a declaration that McGill, Conrad, and Scyster's claims did occur during the Policy period.

Occurrence is defined in the Policy as "an act of rendering or failure to render **pharmacy services** which results in **bodily injury**, or **property damage** within the coverage territory, and during the policy period.  It is an accident, including a continuous or repeated exposure to conditions, neither expected nor intended from the standpoint of the insured." (Pl.'s Mem. Supp. Summ. J. Ex. 1 (Policy Section I, p. 2).)  McGill, Conrad, and Scyster received injections of the drug prior to the effective date of the policy, but did not develop meningitis until after the Policy's effective date.  (Id. 34; Movants' Mem. Supp. Summ. J. 31 Ex. M (McGill Affidavit) & Ex. N (Conrad Certified Judgment); Movants' Mem. Opp'n Pl.'s Summ. J. Ex. M (Scyster Affidavit).)

The Movants allege that under the "modified continuous trigger" theory, McGill, Conrad, and Scyster's bodily injury occurred during the Policy period.  Under this theory, "coverage is triggered at the time of an injury-in-fact and continuously thereafter to allow coverage under all policies in effect from the time of injury-in-fact during the progressive damage."  Joe Harden Builders, Inc. v. Aetna Cas. and Sur. Co., 486 S.E.2d 89, 91 (S.C. 1997).

PMIC alleges that the modified continuous trigger has only been applied in cases involving progressive property damage where it is difficult to determine when the damage occurred.  Therefore, PMIC submits that "it is clear in the case at hand the time of the

16

injection of the allegedly contaminated methylprednisolone into the various complainants'

spinal fluid was the time of an occurrence as it is defined by the policy." (Pl.'s Mem. Supp.

Mot. Summ. J. 35.)  The court disagrees.  In Joe Harden, the South Carolina Supreme Court

cited Abex Corp. v. Maryland Casualty Co., 790 F.2d 119 (D.C. Cir. 1986), to support its

adoption of the modified continuous trigger theory.  Joe Harden, 486 S.E.2d at 91.  Notably,

Abex Corp. involved a determination of when bodily injury occurred as the result of exposure

to asbestos.  Id. at 121.  The court noted in Abex Corp. that

> [t]he plain language of the definition of 'occurrence' used in the [insurance] policy
> requires exposure that 'results, during the policy period, in bodily injury' in order
> for an insurer to be obligated to indemnify the insured.  The unambiguous
> meaning of these words is that an *injury*--and not mere exposure--must result
> *during the policy period.*

Id. at 127.  In the case at bar, the Policy states that an occurrence is "an act of rendering or

failure to render pharmacy services which result in bodily injury . . . during the policy

period." (Pl.'s Mem. Supp. Summ. J. Ex. 1 (Policy Section I, p. 2).)  The only evidence

before the court is that although McGill, Conrad, and Scyster were exposed to the Drug prior

to the effective date of the Policy, they suffered symptoms and were diagnosed with

meningitis during the Policy period.  (Movants' Mem. Supp. Summ. J. 31 Ex. M (McGill

Affidavit) & Ex. N (Conrad Certified Judgment); Movants' Mem. Opp'n Pl.'s Summ. J. Ex.

M (Scyster Affidavit).)  As such, the court finds that, under the modified continuous trigger

theory, McGill, Conrad, and Scyster's bodily injury occurred during the Policy period.

Therefore, PMIC's motion for summary judgment on this ground is denied, and the Movants'

motion for summary judgment is granted.

### E.  Excess Coverage

Finally, the Movants contend that if the primary insurer fails to provide coverage, then PMIC's policy provides primary coverage.  (Movants' Mem. Supp. Summ. J. 31.)  In contrast, PMIC alleges that the Policy is an excess policy.  The Policy states:  "In addition to being excess protection, this policy does protect **you** . . . when **you** are not protected by any other policy."  (Pl.'s Mem. Supp. Summ. J. Ex. 1 (Policy,  p. 1).)  The court finds that the Policy plainly states that it provides primary coverage if no other coverage is available.  Therefore, the court denies PMIC's motion for summary judgment and grants the Movants' motion for summary judgment on this ground.

Therefore, it is

**ORDERED** that PMIC's motion for summary judgment, document number 36,  is denied.  It is further

**ORDERED** that the Movants' motion for summary judgment, document number 35, is granted.

**IT IS SO ORDERED.**

s/ Henry M. Herlong, Jr.
United States District Judge

Greenville, South Carolina
February 7, 2006

18